NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| PENN NATIONAL INSURANCE COMPANY, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> CRUM & FORSTER INSURANCE COMPANY; NORTH RIVER INSURANCE COMPANY; and ABC INSURANCE COMPANIES (1-5) (fictitious names), <br><br> *Defendants*. | Civil No.: 2:9-cv-4644 (KSH) (CLW) <br><br><br><br> **OPINION** |

**Katharine S. Hayden, U.S.D.J.**

Before the Court is a motion for summary judgment filed by plaintiff Penn National Insurance Company, Inc. ("Penn National") (D.E. 58), and a cross-motion for summary judgment filed by defendant North River Insurance Company ("North River") (D.E. 59). Penn National, as primary insurer, and North River, as excess carrier, are seeking declaratory relief regarding their rights and obligations with respect to insurance coverage they provided to Gus Bittner, Inc. ("Bittner"), a defunct New Jersey waste hauler named as a defendant and/or third-party defendant in several environmental superfund litigations. For the reasons set forth below, the motions are denied, and the parties are directed to appear before the Court for supplemental oral argument on Friday, July 7, 2017 at 2:00PM.

1

**I.     Discussion**

The parties stipulated to the following facts in their final pretrial order (D.E. 57) ("FPTO").  Bittner is a defunct New Jersey corporation that was in the business of hauling waste from various companies and municipalities to landfills located throughout the State of New Jersey from the late 1950s until approximately 1996.  FPTO, at p. 4, ¶¶ 1–2.  As relevant to this action, Bittner deposited waste at the following landfills in southern New Jersey: (1) the Buzby Brothers Landfill, located in Vorhees (the "Buzby landfill"); (2) the Big Hill Sanitary Landfill, located in Southampton Township and operated by the Burlington Environmental Management Services, Inc. (the "BEMS landfill"); and (3) the Helen Kramer Landfill, located in Mantua (the "Helen Kramer landfill").  *Id.* at ¶ 3.

After these landfills closed, Bittner was named as a defendant and/or third-party defendant in various superfund lawsuits as an alleged transporter of refuse and waste materials.  The lawsuits relevant to the instant motion are: (1) *Incollingo, et al v. RCA Corp, et al, v. Buzby Brothers, et al.*, 87-cv-4263 (D.N.J. 1987) (the "Buzby litigation"); (2) *NDJEP v. Burlington Environmental Management Services, Inc., et al.*, BUR-L-895-02 (N.J. Sup. Ct. 2002) (the "BEMS litigation"); and (3) *United States of America v. Helen Kramer, et al.*, 89-cv-4340 (D.N.J. 1989) (the "Helen Kramer litigation").  FPTO, at p. 6, ¶¶ 22–23.

Bittner was insured by Penn National under several commercial general liability insurance policies for the period beginning January 30, 1976 through January 30, 1986.  FPTO, at p. 7, ¶ 25.  North River insured Bittner under various excess/umbrella policies for the period beginning January 30, 1976 through January 30, 1985.  FPTO, at p. 11, ¶ 37.  The North River excess policies required exhaustion of the limits of Penn National's primary policies before North River incurred any defense and indemnity obligations.  FPTO, at p. 12, ¶ 40.

Penn National provided a defense to Bittner in the Helen Kramer, Buzby, and BEMS litigations and made indemnity payments on Bittner's behalf in the amounts of $2,550,320.00, $99,590.00, and $48,013.00, respectively, for a total of $2,697,923.00. FPTO, at p. 13, ¶¶ 43–46. North River paid $349,680.00 on Bittner's behalf as part of the settlement reached in the Helen Kramer litigation. FPTO, at p. 14, ¶ 48.

On September 9, 2009, Penn National, as primary insurer, filed a declaratory judgment action (D.E. 1) against North River, as excess carrier, seeking reimbursement for defense and indemnity payments Penn National made that allegedly exceed the limits of the insurance policies it issued to Bittner. In March 2012, the parties cross-moved for summary judgment (D.E. 26, 29), which the district court denied in an opinion dated November 20, 2012 (D.E. 30) after finding that material issues of fact existed as to whether: (a) Penn National's payment toward the Helen Kramer litigation was a binding settlement that precludes it from seeking contribution from North River; and (b) Penn National's primary policies were exhausted such that North River incurred defense and indemnity obligations under its excess policies. After further discovery, the parties again moved for summary judgment before the undersigned, and the motions were fully briefed (D.E. 58, 63, 66, 59, 64, and 65). The Court heard oral argument on May 23, 2017.

In its complaint, Penn National asks the Court to declare that the limits of its primary policies have been exhausted, and that North River is required to reimburse and contribute to Penn National North River's share of any past and future indemnification and defense costs in excess of the aggregate limits in Penn National's primary policies, pursuant to the New Jersey Supreme Court's holding in *Carter-Wallace, Inc. v. Admiral Ins. Co.*, 154 N.J. 312 (1998), which provides a method for allocating responsibility among insurers where both primary and

excess policies are in effect for cases involving long-term environmental damages. *See* Compl., at p. 6. When Penn National filed its complaint in 2009, both the Helen Kramer and Buzby litigations were resolved, but the BEMS litigation was still ongoing. At that time, Penn National sought reimbursement in the amount of $349,520.00 for past amounts allegedly expended in excess of the aggregate limits in its primary policies. *See id*.

The BEMS litigation settled in 2011, and in the first round of summary judgment applications filed in March 2012, Penn National sought a *Carter-Wallace* allocation of amounts it paid on Bittner's behalf in all three underlying lawsuits. In its 2012 papers (D.E. 26), Penn National conceded that the primary policies it issued to Bittner for the years 1976 through 1981 do not contain aggregate limits, and that "[b]ecause these policies do not contain aggregate limits . . . these payments are the responsibility of Penn National and thus, no claim is made for North River's excess coverage with regard to those years." Penn National 2012 Moving Br. (D.E. 26-3), at p. 29. However, Penn National argued that the 1982-1983 primary policy it issued to Bittner did contain an aggregate limit that was exhausted pursuant to a *Carter-Wallace* allocation, and that North River was required to contribute $394,860.00 in indemnification costs, plus an additional $27,810.83 in defense costs related to the BEMS litigation, for a total of $422,670.23 that Penn National allegedly paid in excess of the limits contained in its primary policies. *See id*. at pp. 34–37; Exhibit Z (D.E. 26-29).

In its instant summary judgment motion (D.E. 58), Penn National again seeks a *Carter-Wallace* allocation of amounts it paid on Bittner's behalf in the Helen Kramer, Buzby, and BEMS litigations. But it now takes a different position regarding exhaustion of its primary policies, one that is manifestly at odds with its 2012 contentions. In a devoted section of its 2012 moving brief, Penn National conceded that the absence of aggregate limits in the primary

4

policies for years 1976 through 1981 made it fully responsible for costs attributable to those years. Penn National 2012 Moving Br. (D.E. 26-3), at p. 29. Penn National now argues that those primary policies are exhausted under a *Carter-Wallace* allocation, regardless of whether they contain aggregate limits. On this theory, Penn National asserts that pursuant to a *Carter-Wallace* allocation, North River must contribute a total of $1,536,835.02 in indemnity costs, plus an additional $91,392.80 in defense costs related to the BEMS litigation, for a total of $1,628,227.82 that Penn National allegedly paid in excess of the limits contained in its primary policies. *See* Penn National Moving Br. (D.E. 58-1), at pp. 16–23. Thus, applying identical facts to identical case law, Penn National appears to be looking for North River to pay nearly four times the amount it specified in its 2012 summary judgment motion.

For its part, North River has engaged in no *Carter-Wallace* analysis at all, even though that landmark case speaks directly to the required allocation of costs between primary and excess insurers. This is based on North River's general position that Penn National has failed to establish proper exhaustion. It argues that Penn National cannot retroactively re-allocate amounts paid in settlement of the Helen Kramer litigation (*see* North River Opp. Br. (D.E. 63), at pp. 3–10), and challenges Penn National's failure to contend with the issue of aggregate limits in its primary policies in light of seemingly inconsistent positions at earlier stages of the litigation. North River Opp. Br., at pp. 8–10. Of significance to that argument is the parties' stipulation that Penn National's primary policies must be exhausted before North River incurs any defense and indemnity obligations. *See* FPTO, at p. 12, ¶ 40. North River also raises statute of limitations and laches defenses, highlighting an apparent inconsistency in Penn National's position that its claims against North River did not accrue until settlement of the BEMS litigation

5

in 2011, despite the fact that it filed the complaint two years prior in 2009. *See* North River Moving Br., at pp. 1–10.

Evidently the parties seek a declaratory ruling from the Court while making arguments that talk past one another. In doing that, they presuppose a right under the Declaratory Judgment Act ("DJA") to the *remedy* the act provides. *See Auto–Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 394 (3d Cir. 2016) (the DJA "does not itself create an independent basis for federal jurisdiction but instead provides a remedy for controversies otherwise properly within the court's subject matter jurisdiction"). Under the DJA, "any court of the United States . . . *may* declare the rights and other legal relations of any interested party." 28 U.S.C. § 2201 (emphasis added). The Supreme Court has made clear that "[s]ince its inception, the [DJA] has been understood to confer on federal courts *unique and substantial discretion* in deciding whether to declare the rights of litigants." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995) (emphasis added).

The Court declines to exercise that discretion at this time and seeks a reconciliation by Penn National of its inconsistent positions regarding exhaustion of its primary policies under a *Carter-Wallace* allocation, particularly in light of the fact that Penn National asks the Court to set aside amounts the parties' paid toward settlement of a litigation that happened nearly two decades ago. It denies summary judgment as to both motions. At this point, the parties' extensive briefing need not be supplemented in writing; rather, the Court has determined that supplemental oral argument from both sides is the appropriate next step in this years old litigation. The parties are directed to appear before the Court for supplemental oral argument on Friday, July 7, 2017 at 2:00PM to address first, the existence of aggregate limits in Penn

National's primary policies, and second, the way in which any such aggregate limits impact the exhaustion of Penn National's primary policies under a *Carter-Wallace* allocation.

**II.     Conclusion**

For the foregoing reasons, Penn National's motion (D.E. 58) is **denied**, and North River's motion (D.E. 59) is **denied**.  An appropriate order will be entered.

s/ Katharine S. Hayden_____<br>Katharine S. Hayden, U.S.D.J.

Dated: June 29, 2017