NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| PENN NATIONAL INSURANCE COMPANY, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> CRUM & FORSTER INSURANCE COMPANY; NORTH RIVER INSURANCE COMPANY; and ABC INSURANCE COMPANIES (1-5) (fictitious names), <br><br> *Defendants*. | Civil No.: 2:9-cv-4644 (KSH) (CLW) <br><br><br><br> **OPINION** |

**Katharine S. Hayden, U.S.D.J.**

Penn National Insurance Company, Inc. ("Penn National"), as primary insurer, and North River Insurance Company ("North River"), as excess carrier, are seeking declaratory relief regarding their rights and obligations with respect to insurance coverage they provided to Gus Bittner, Inc. ("Bittner"), a defunct New Jersey waste hauler named as a defendant and/or third-party defendant in several environmental superfund litigations. The Court heard oral argument on May 23, 2017, and in an opinion dated June 29, 2017 (D.E. 75) the Court denied the parties' motions for summary judgment (D.E. 58, 59), declining to exercise its discretion under the Declaratory Judgment Act and to render a decision on the merits without a reconciliation from Penn National of seemingly inconsistent positions it has taken throughout this nearly eight-year litigation. For the reasons set forth below, and in light of supplemental oral argument by the parties on July 7, 2017, the Court now rules on the merits of the parties' summary judgment

1

motions. For the reasons set forth below, Penn National's motion (D.E. 58) is denied and North River's motion (D.E. 59) is granted.

**I.     Background**

The parties stipulated to the following facts in their final pretrial order (D.E. 57) ("FPTO").

Bittner is a defunct New Jersey corporation that was in the business of hauling waste from various companies and municipalities to landfills located throughout New Jersey from the late 1950s until approximately 1996. FPTO, at p. 4, ¶¶ 1–2. As relevant to this action, Bittner deposited waste at the following landfills in southern New Jersey: (1) the Buzby Brothers Landfill, located in Vorhees (the "Buzby landfill"); the Big Hill Sanitary Landfill, located in Southampton Township and operated by the Burlington Environmental Management Services, Inc. (the "BEMS landfill"); and the Helen Kramer Landfill, located in Mantua (the "Helen Kramer landfill"). *Id.* at ¶ 3.

After these landfills closed, Bittner was named as a defendant and/or third-party defendant in various superfund lawsuits as an alleged transporter of refuse and waste materials. The lawsuits relevant to this action are: (1) *Incollingo, et al v. RCA Corp, et al, v. Buzby Brothers, et al.*, 87-cv-4263 (D.N.J. 1987) (the "Buzby litigation"); (2) *NDJEP v. Burlington Environmental Management Services, Inc., et al.*, BUR-L-895-02 (N.J. Sup. Ct. 2002) (the "BEMS litigation"); and (3) *United States of America v. Helen Kramer, et al.*, 89-cv-4340 (D.N.J. 1989) (the "Helen Kramer litigation"). FPTO, at p. 6, ¶¶ 22–23.

Bittner was insured by Penn National under several commercial general liability insurance policies for the period beginning January 30, 1976 through January 30, 1986. FPTO, at p. 7, ¶ 25. North River insured Bittner under various excess/umbrella policies for the period beginning January 30, 1976 through January 30, 1985. FPTO, at p. 11, ¶ 37. The North River

2

excess policies required exhaustion of the limits of Penn National's primary policies before North River incurred any defense and indemnity obligations. FPTO, at p. 12, ¶ 40.

Penn National provided a defense to Bittner in the Helen Kramer, Buzby, and BEMS litigations. In May 1998, Penn National paid $2,550,320.00 and North River paid $349,680.00 to settle claims against Bittner in the Helen Kramer litigation. FPTO, at p. 13, ¶¶ 43–46; *id.* at p. 14, ¶ 48. Penn National also made indemnity payments on Bittner's behalf in the amounts of $99,590.00 and $48,013.00, in 2007 and 2011, respectively, in settlement of the Buzby and BEMS litigations.

In July 1998, two months after the Helen Kramer litigation settled, the New Jersey Supreme Court in *Carter-Wallace, Inc. v. Admiral Ins. Co.*, 154 N.J. 312 (1998) set forth an allocation scheme for measuring the responsibility of an excess insurer in the context of long-term environmental damage cases where both primary and excess policies are in effect. On September 9, 2009, Penn National, as primary insurer, filed a declaratory judgment action (D.E. 1) against North River, as excess carrier, seeking reimbursement, pursuant to *Carter-Wallace*, for defense and indemnity payments Penn National made that allegedly exceed the limits of the insurance policies it issued to Bittner. In its complaint, Penn National sought reimbursement in the amount of $349,520.00 for past amounts allegedly expended in excess of the aggregate limits in its primary policies, in addition to any future indemnification and defense costs owed to it under a *Carter-Wallace* allocation.

In March 2012, after the BEMS litigation settled, the parties moved for summary judgment (D.E. 26, 29), with Penn National arguing that North River was required to contribute a total of $422,670.23 in defense and indemnity costs under *Carter-Wallace*. *See* Penn National 2012 Moving Br. (D.E. 26-3), at pp.34–37; Exhibit Z (D.E. 26-29). The court denied those

motions in an opinion dated November 20, 2012 (D.E. 30) after finding that material issues of fact existed as to whether: (a) Penn National's payment toward the Helen Kramer litigation was a binding settlement that precludes it from seeking contribution from North River; and (b) Penn National's primary policies were exhausted such that North River had defense and indemnity obligations under its excess policies.

After further discovery, the parties again moved for summary judgment before the undersigned (D.E. 58, 63, 66, 59, 64, and 65), with Penn National now asserting that pursuant to a *Carter-Wallace* allocation, North River owes it approximately $1,628,227.82 in defense and indemnity costs, nearly four times the amount it specified in its 2012 summary judgment motion.

The Court heard oral argument on May 23, 2017 and denied the parties' motions in an opinion dated June 29, 2017 (D.E. 75), declining exercise its discretion to declare the rights and obligations of the parties under the Declaratory Judgment Act and to render a decision on the merits without a reconciliation from Penn National of the seemingly inconsistent positions it has taken throughout the instant litigation regarding coverage under the applicable policies.

The Court heard supplemental oral argument on July 7, 2017 and now rules on the merits of the parties' motions.

## II.     Legal Standard

Under Federal Rule of Procedure 56, "[s]ummary judgment is appropriate when the movant shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "has the burden of demonstrating that the evidentiary record presents no genuine issue of material fact." *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015). A court's function at the summary judgment stage is to "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505,

2511, 91 L. Ed. 2d 202 (1986). "Interpretation of an insurance contract is a question of law for the Court's determination, and thus the issue may be decided on summary judgment." *U.S. Specialty Ins. Co. v. Sussex Airport, Inc.*, No. CV145494SRCCLW, 2016 WL 2624912, at *3 (D.N.J. May 9, 2016) (citing *Simonetti v. Selective Ins. Co*, 372 N.J. Super. 421, 428 (App. Div. 2004)).

**III.   Discussion**

Under New Jersey law, every action "for recovery upon a contractual claim or liability, express or implied . . . shall be commenced within 6 years next after the cause of any such action shall have accrued." N.J.S.A. 2A:14-1. Here, the applicable accrual date depends on whether Bittner's hauling activity at each of the Helen Kramer, Buzby, and BEMS landfills constitutes a single occurrence or separate occurrences under New Jersey law. North River argues that Bittner's disposal of waste at separate landfills are separate occurrences, and that the statute of limitations on any claims that Penn National had with respect to the Helen Kramer site began to accrue immediately upon settlement of the Helen Kramer litigation in 1998. *See* North River Reply Br. (D.E. 65), at pp. 1–7. By contrast, Penn National argues that because Bittner's hauling activities at each of the three landfills constitute one single occurrence under New Jersey law, the allocation principles set forth in *Carter-Wallace* could not be applied, and its cause of action for contribution against North River did not accrue, until the BEMS litigation was settled in 2011. *See* Penn National Opp. Br. (D.E. 64), at pp. 8–12.

So the initial determination must be whether Bittner's hauling activity at each of the Helen Kramer, Buzby, and BEMS landfills were separate occurrences, and under New Jersey law the Court holds that they were. As an initial matter, Penn National's corporate designee testified that Penn National itself considered Bittner's disposal of waste at separate landfills to be separate occurrences. *See* Transcript of Deposition of Boyd Wright, dated June 25, 2010 (D.E.

5

59-11) at 50:6–51:1 ("each site was considered a separate occurrence"); *id.* at 121:14–122:17 (same). At oral argument, counsel for Penn National argued that despite Wright's statements, "claims adjustor's testimony don't make the law." *See* Transcript of Oral Argument, dated May 23, 2017, at 11:6–9. But under the relevant cases, Wright's interpretation of the Penn National policies regarding single versus multiple occurrences turns out to be consistent with New Jersey law.

The seminal case on single versus multiple occurrences under insurance policies, *Doria v. Ins. Co. of N. Am.*, 210 N.J. Super. 67 (App. Div. 1986), turned on whether injuries sustained by two young boys after one fell into an abandoned swimming pool and the second fell in trying to rescue him were caused by one or two occurrences under a homeowners' liability policy. *Id.* at 69. The court decided that "for the purpose of counting the number of occurrences, the term must be construed from the point of view of the cause or causes of the accident rather than its effects." *Id.* at 72–73. The court also explained that the number of occurrences depends on the "temporal and spatial connection" between the injuries. *Id.* at 75. On the facts, the court found:

> The boys entered the premises together through the dilapidated fence and became exposed to the uncovered pool precisely at the same time. There was absolutely no change in the dangerous quality of the pool during the intervening seconds between their respective falls into the pool. Andrew's fall was precipitated by his immediate attempt to rescue his brother. Essentially, the injuries to both boys occurred simultaneously while they were submerged in the pool water. Both were rescued at the same time. Their falls and respective injuries occurred during a single, brief sequence of events so closely linked in time and space as to be considered by the average person as one event.

*Id.* at 75–76.

Applying the logic of *Doria*, and consistent with Penn National's corporate designee's deposition testimony, the Court finds that Bittner's hauling activities at the Helen Kramer, Buzby, and BEMS landfills constitute separate occurrences under New Jersey law. In *Doria*, two boys

6

were exposed to a negligent condition "precisely at the same time," and "the injuries to both boys occurred simultaneously . . . during a single, brief sequence of events." Here, Bittner hauled to separate landfills, in separate geographical locations, at separate times over the course of nearly a decade, causing alleged environmental damage at distinct and discrete locations.

Penn National's argument that its claims for contribution with respect to the underlying superfund litigations were not ripe until the BEMS litigation settled in 2011 is further weakened by the fact that it filed the instant complaint in 2009, two years *prior to* the BEMS settlement, seeking past *and future* indemnification and defense costs owed to it under a *Carter-Wallace* allocation. When asked at supplemental oral argument why Penn National did not seek such relief in 1998, after the Helen Kramer litigation settled—and in the immediate wake of the *Carter-Wallace* decision—counsel was candid in not offering an explanation. *See* Transcript of Supplemental Oral Argument, dated July 7, 2017, at p. 32:5–17.

The Court rejects the notion that Bittner's activities in hauling waste to the Helen Kramer, Buzby, and BEMS landfills—spatially and temporally distinct events—should be reduced to a single occurrence under the applicable policies. *Carter-Wallace* noted the importance of "respecting the distinction between primary and excess insurance" and found that its method of apportionment was "consistent with contract language . . . [providing that the excess carrier's] second-level excess policy will not be pierced unless and until the primary and first-level excess policies in effect for a given year have been expended." *Carter-Wallace, Inc. v. Admiral Ins. Co.*, 154 N.J. 312, 327 (1998). Here, as excess carrier, North River contracted for liability only to the extent that Bittner's primary policies are exhausted. Penn National argues that the amount paid in settlement of the Helen Kramer litigation exhausts its primary policies and is inextricably linked to Bittner's hauling at the other sites. But at the same, Penn

7

National concedes, as it must, that each site has a different trigger period. And although it argues that its claims for contribution were not ripe until litigation regarding all three landfills settled, Penn National brought the instant action *two years before* the BEMS litigation settled, and candidly admits that it could have brought suit on the Helen Kramer landfill when *Carter-Wallace* was decided in 1998. While *Carter-Wallace* established that New Jersey courts seek a fair apportionment of liability between primary and excess carriers, its holding does not strain logic (nor did Penn National's corporate representative when he testified that Bittner's hauling activity at each site was a separate occurrence). Here, the cause of the harm flowing from Bittner's waste hauling is distinct as to each landfill, and Bittner's hauling activities in the abstract cannot be rolled into one single occurrence.

Because Bittner's hauling operations constitute separate occurrences, Penn National's claim for contribution against North River with respect to the Helen Kramer litigation accrued in 1998 and is time barred under N.J.S.A. 2A:14-1, and the issue becomes whether Penn National's 2009 complaint entitles it to contribution for the Buzby litigation, which settled in 2007, and the BEMS litigation, which settled in 2011. Penn National made indemnity payments on Bittner's behalf for the Buzby and BEMS litigations in the amounts of $99,590 and $48,013.00, respectively. Each of the policies Penn National issued to Bittner between 1976 and 1982 contained per occurrence limits of $100,000, and each of the policies Penn National issued to Bittner between 1982 and 1985 contained per occurrence limits of $500,000. *See* FPTO, at ¶¶ 26–31, 33. The North River excess policies required exhaustion of the limits of Penn National's primary policies before North River incurred any defense and indemnity obligations. FPTO, at p. 12, ¶ 40. Accordingly, North River argues, because "[n]either of the indemnity payments made by Penn National in the Buzby and BEMS cases . . . exceed the per occurrence limits in even one

of the primary policies" Penn National's primary policies were never exhausted. *See* North River's Moving Br. (D.E. 59-33), at p. 18. Indeed, Penn National's own *Carter-Wallace* calculations with respect to the Buzby and BEMS litigations rely on amounts paid toward the Helen Kramer litigation to establish exhaustion of Penn National's primary policies. *See* Penn National's Moving Br., at p. 20 (Buzby: "*On account of the payments made by Penn National on the Helen Kramer landfill*, Penn National's policy limits for the years 1977-1978 through 1982-193 have been exhausted") (emphasis added); *id.* at p. 22 (BEMS: "Again, Penn National's policy limits have been exhausted for policy years 1977-1978 through 1982-1983, *on account of settlement of the Helen Kramer litigation*") (emphasis added). Thus, as counsel for North River stated at oral argument, and consistent with Penn National's own *Carter-Wallace* calculations, "Penn National does not recover a [d]ime from North River unless and until it is able to reallocate the [Helen] Kramer settlement. And if it can't do that the case is over." *See* Transcript of Oral Argument, dated May 23, 2017, at p. 27:8–11.

Because Penn National's claim with respect to the Helen Kramer litigation is time barred, it cannot establish exhaustion of its primary policies with respect to amounts it paid for the Buzby and BEMS litigations, and North River's did not incur any liability under the excess policies it issued to Bittner.

## IV. Conclusion

For the foregoing reasons, the Penn National's motion (D.E. 58) (seeking judgment that North River owes it indemnity and defense payments) is **denied**, and North River's motion (D.E. 59) (seeking dismissal of Penn National's claims with prejudice) is **granted**. An appropriate order will be entered.

s/ Katharine S. Hayden_____
Katharine S. Hayden, U.S.D.J.

9

Dated: September 1, 2017